# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mai V., | Case No. 22-CV-2086 (JFD) |
| Plaintiff, | |
| v. | **ORDER** |
| Martin J. O'Malley, Commissioner of the Social Security Administration, | |
| Defendant. | |

Pursuant to 42 U.S.C. § 405(g), Plaintiff Mai V. seeks judicial review of a final decision by the Commissioner of the Social Security Administration, which denied the Plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The case is before the Court on Plaintiff's Brief requesting that the Commissioner's decision be reversed and the matter remanded to the Social Security Administration (Dkt. No. 12) as well as the Commissioner's Motion for Summary Judgment requesting that the decision be affirmed (Dkt. No. 15). Plaintiff argues that the administrative law judge ("ALJ") who issued the written decision erred in two respects. First, Plaintiff contends that the ALJ did not fully account for the residual effects of Plaintiff's strokes in assessing her residual functional capacity ("RFC"). Second, Plaintiff asserts that the ALJ did not properly evaluate medical opinion evidence. Defendant opposes Plaintiff's arguments and asks the Court to affirm the final decision. As set forth below, the Court concludes that the ALJ erred in both respects, and the Court therefore

reverses the Commissioner's decision and remands the matter for further administrative proceedings.

## I.    Background

Plaintiff applied for DIB and SSI on February 28, 2020, alleging she has been disabled since October 7, 2019. (*See* Soc. Sec. Admin. R. (hereinafter "R.") 53.)[1] Her alleged impairments were moyamoya disease, strokes, cerebrovascular accident, hypothyroidism, type 2 diabetes, peer hyper cholesterol, diabetic neuropathy, left carotid stenosis, mood disorder, and adjustment disorder with mixed anxiety and depressed mood. (R. 52–53.)

### A.    Relevant Evidence

"Moyamoya disease is a rare, progressive cerebrovascular disorder caused by blocked arteries at the base of the brain in an area called the basal ganglia." National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/health-information/disorders/moyamoya-disease (last visited Mar. 21, 2024). Adults with moyamoya disease may experience symptoms of "stroke or recurrent transient ischemic attacks (TIAs), also known as 'mini-strokes,' that are frequently accompanied by muscular weakness or paralysis affecting one side of the body," "hemorrhagic stroke due to bleeding into the brain," headaches, seizures, disturbed consciousness, involuntary movements, vision problems, and cognitive or sensory impairment. *Id.*

---

[1] The administrative record is filed at Dkt. No. 11. The record is consecutively paginated, and the Court cites to that pagination rather than ECF number and page.

A summary of some evidence preceding the alleged onset-of-disability date of October 7, 2019, is helpful for context. In early November 2018, Plaintiff was admitted to an emergency room after experiencing sudden left arm and leg weakness. (R. 440.) Imaging confirmed a right middle cerebral artery ("MCA") territory stroke, consistent with moyamoya disease. (R. 473.) A history of prior left MCA territory strokes was also noted. (R. 463.) When Plaintiff was discharged after four days to a rehabilitation center, she was not at her baseline level of functionality, but demonstrated mild to moderate impairments and limitations, needed assistance to use a walker, and was fatigued by a physical therapy session. (R. 477.)

Plaintiff saw provider Sarah Hammes, M.D., 10 days after the November 2018 stroke. (R. 590.) Dr. Hammes wrote that the stroke was Plaintiff's second stroke[2] and was likely related to moyamoya disease. After Plaintiff's stroke in 2017, she had been advised to have a stent placed by neurosurgery, but she did not follow up for several reasons, including scheduling difficulties, lack of insurance, and language difficulties. (R. 315, 590.) Plaintiff speaks Hmong, but her ability to read or write Hmong is spotty. (R. 39, 239.) She does not speak, read, or write English. (R. 39.) On examination, Dr. Hammes observed that Plaintiff could walk around the room with equal movement, strength, and coordination of the upper and lower extremities. (R. 592.) Dr. Hammes recorded similar neurological findings in December 2019. (R. 603.) Dr. Hammes wrote that Plaintiff seemed confused at the November 2018 appointment, and at the December 2019 appointment, Plaintiff did not

[2] The November 2018 stroke was likely Plaintiff's third stroke. Plaintiff reported having her first stroke in 2013 and a second stroke in 2017. (R. 642.)

always understand the doctor's questions and an interpreter had to explain things several ways. (R. 592, 603.)

At a medication management appointment in February 2020, Plaintiff reported low drive and poor sleep. (R. 615.) She also reported tingling on her left side and said she had recently fallen four times in one day. (R. 617.)

In October 2020, Ward Jankus, M.D., conducted a consultative examination of Plaintiff. (R. 642.) Plaintiff reported having strokes in 2013, 2017, and 2018. (R. 642.) Plaintiff told Dr. Jankus that her left leg felt heavy at times and that her left hand was slower than her right hand. (R. 642.) Plaintiff estimated that her left hand, arm, foot, and leg had about 80% of the strength and functioning of her right hand, arm, foot, and leg. (R. 643.) On examination, Dr. Jankus observed that Plaintiff's reflexes were symmetric, strength was symmetric and a 5/5, and gait was smooth. (R. 644.) Dr. Jankus observed a "trace" amount of clumsiness and weakness in her left hand, but no severe fine motor issues. (R. 644.) Dr. Jankus thought Plaintiff "seems to have made a pretty good recovery" but did not doubt that her left arm and leg were not 100%. His impression was a history of strokes, "with residual subjective left arm and leg weakness/coordination issues." (R. 644.) To account for the risk of falling, Dr. Jankus recommended that she avoid unprotected heights, ladders, and uneven surfaces. (R. 645.) Regarding Plaintiff's estimation of 80% functionality in her left arm, hand, and leg, Dr. Jankus commented that "perhaps something in that range is pretty realistic." (R. 645.)

Plaintiff returned to Dr. Hammes for another appointment in November 2020. Plaintiff reported numbness and tingling in the left hand, left-side weakness, and difficulty

swallowing. (R. 656.) Dr. Hammes wrote that Plaintiff had not followed up on the referral to neurology or taken her diabetes medication as prescribed. (R. 654.) Dr. Hammes also noted that Plaintiff's depression was not well managed and that she was at a high risk of stroke due to lack of follow-up and inconsistencies in taking medication. (R. 654.) The lack of follow-up was due in part to "insurance lapses." (R. 654.) A physical examination confirmed that Plaintiff's left-hand grip was weaker than her right-hand grip and that Plaintiff had numbness and tingling in her left hand. (R. 657.) Plaintiff moved slowly from a chair to the examining table, but her gait was steady. (R. 657.)

Plaintiff had another stroke shortly after seeing Dr. Hammes, on December 23, 2020. (R. 882.) Dr. Hammes completed a Medical Source Statement on January 18, 2021, less than one month later. Dr. Hammes opined that, in an 8-hour workday, Plaintiff could lift and carry no more than 20 pounds occasionally with her right arm only, lift and carry no more than 10 pounds frequently with her right arm only, stand and walk about 2 hours, and sit for about 4 hours. (R. 1027.) Plaintiff could sit for 20 minutes before needing to change positions and could stand for 15 minutes before needing to change positions. (R. 1028.) She would have to walk around every 15 minutes for up to 5 minutes at a time. (R. 1028.) She would also need to shift at will from sitting, standing, or walking, and would need to lie down at unpredictable intervals every two to four hours due to fatigue, dizziness, and pain. (R. 1028.) Dr. Hammes listed the underlying conditions and medical findings as "MoyaMoya causing blockage & Ischemic Strokes in multiple blood vessels of the brain on both sides." (R. 1028.) Dr. Hammes opined that Plaintiff could never stoop, crouch, climb ladders, or use repetitive foot controls with her left foot; that Plaintiff could

5

occasionally twist, climb stairs, rotate her neck, and flex her neck; and that Plaintiff could frequently use repetitive right-foot controls. (R. 1029.) Plaintiff's abilities to reach, handle, finger, feel, push, and pull would be affected by her impairments; she could never handle or finger with her left hand; and she could occasionally handle or finger with her right. (R. 1029.) Dr. Hammes attributed the restrictions to left-sided weakness and stiffness from strokes and identified an MRI as supporting evidence. (R. 1029.)

After Plaintiff's December 2020 stroke, she had frequent home care visits for nursing, physical therapy, occupational therapy, and other services in January and February. A home-care-visit record dated February 17, 2021, when Plaintiff was discharged from services, documented a recommendation for outpatient therapy for right-side weakness and limited abilities to dress and bathe. (R. 707, 711.)

Plaintiff saw Dana Peterson, a CNP in neurology, on February 18, 2021. (R. 704.) Plaintiff reported having left-side weakness since her 2018 stroke, and even more weakness since the December 2020 stroke; blurry vision in both eyes; and the same amount of numbness in her left side as before the stroke. (R. 704.) She denied headaches or dizziness. (R. 704.) On examination, Ms. Peterson observed full strength on the right side, but weakness, reduced coordination, reduced sensation, and reduced strength on the left side. (R. 704.) Due to Plaintiff's "multiple strokes related to worsening stenosis," Ms. Peterson recommended bypass surgery. (R. 704.)

In March 2021, Plaintiff told Dr. Hammes that she had a tingling sensation in her left hand and feet; walking was painful; and stiffness impaired her abilities to move and walk. (R. 695–96.) Plaintiff reportedly had fallen several times in recent months and was

6

interested in using a cane. (R. 696.) Plaintiff walked with a limp and held on to her husband for assistance. (R. 697.) Dr. Hammes recorded "significant left side[] weakness and stiffness" in Plaintiff's upper and lower extremities. (R. 697.) The doctor also remarked that Plaintiff frequently deferred to her husband to answer questions and wondered whether Plaintiff did not know the answer or had trouble finding the words to answer. (R. 697.) Plaintiff wanted to discuss Ms. Peterson's recommendation for bypass surgery with her family. (R. 694.)

**B.    Procedural History**

Plaintiff's DIB and SSI applications were denied at both the initial review and reconsideration stages. She requested an administrative hearing before an ALJ, and the hearing took place on June 22, 2021. (R. 33.) Plaintiff and a vocational expert, Ms. Spielman, testified at the hearing. The hearing was conducted by telephone because of the COVID-19 pandemic. (R. 36, 184.) A Hmong interpreter translated portions of the proceeding. (R. 35–36.)

Plaintiff testified in relevant part that she could not work because of symptoms resulting from her strokes, namely weakness in her left hand and arm. (R. 40.) Plaintiff testified that her left hand was "pretty much completely paralyzed," and she could not even button a shirt or hold a coffee cup with her left hand. (R. 41.) Plaintiff has never driven a car. (R. 39.) Plaintiff testified that her left-hand limitations dated back to November 2019. (R. 41.) At that point, the interpreter spoke up to clarify what Plaintiff had just said.

INT:   The interpreter just needs to clarify that part.

7

A      You're saying that since the last -- the second stroke, is that correct?[3] Yes. Since the last stroke, the second stroke that I had, I cannot be able to do anything, anymore.[4]

Q      Okay. So, before that second stroke, were you having any difficulties using your left hand?

A      Yes. Before the second stroke, I still had the movement, too. So, I'd been working really hard to -- regaining its function. But after the second stroke, I just cannot be able to use it anymore.

(R. 42.)

The ALJ then asked Plaintiff how she had spent her days before the December 2020 stroke, to which Plaintiff responded that she mostly sat around but could do some minor dishwashing, sweeping, grocery shopping, and running errands. (R. 43.) Through the interpreter, Plaintiff testified that, "prior to the second stroke, I'd still be able to function. I'd still be able to go and do those stuff," referring to grocery shopping and running errands. (R. 43.) Plaintiff's representative then asked Plaintiff to recall when she stopped working as a personal care assistant in October 2019. (R. 44.)

---

[3] As noted above, Plaintiff had four strokes, in 2013, 2017, 2018, and 2020. The use of "first" and "second" strokes in the hearing transcript is confusing and seem to be references to the 2018 and 2020 strokes, which are actually Plaintiff's third and fourth strokes. This is not harmless. As will be seen further on in this Order, confusion about which stroke is which eventually led the ALJ to think Dr. Hammes' opinion evidence related to a period of only one month, which would mean Plaintiff's disability had not lasted 12 months, as required for a finding of disability under the social security regulations. Dr. Hammes' opinion evidence actually referred to a period of *more than two years*.

[4] This answer, as reflected on the transcript, actually combines the interpreter's question with Plaintiff's answer. It is clear from the context that the interpreter asked, "You're saying that since the last -- the second stroke, is that correct?" Plaintiff then answered, "Yes. Since the last stroke, the second stroke that I had, I cannot be able to do anything, anymore."

8

Q      Okay, because that's when you had a stroke.[5] So, after your first stroke, were you having any problems using your left hand, at all?

INT:   Counsel, you're talking about the first stroke, or the second stroke?

REP:  The first one.

A      No issue.

Q      Okay. Then why did you stop working as a PCA?

A      Well, because of my stroke. I cannot help myself. . . . That's why I stopped working.

Q      Okay. Why couldn't you help yourself after the first stroke? What was it that was going on with you, that prevented you from helping yourself?

A      So, after going to the hospital, coming back, I was pretty much paralyzed. I'm not able to help myself and such. That's the reason.

Q      That was after the first stroke?

A      Yes.

Q      And how long did that last?

A      That's not been improving. I really want it to get better, but things just getting worse, and going downhill since then.

Q      But did you make some improvement after your first – between your first stroke and your second stroke?

A      No change. It seems like it's just getting bigger and bigger.

Q      Okay. One more clarifying question. After your first stroke, you testified to being able to go to the grocery store, and do things that you weren't able to do after the second stroke. Is that correct?

A      Yes. That's correct.

---

[5] There is no record of Plaintiff having a stroke in or around October 2019.

9

> Q      Okay. So I want to hone in on – you said you weren't able to take care of yourself after the first stroke. But you were able to go to the grocery store, and you were able to do some sweeping? But -- so, what limitations did you have after the first stroke?
>
> A      The problems -- the biggest problem is after the second stroke. That's when I could not be able to do anything. I feel like I'm going to fainted, if I move it about.

(R. 44–45.)

The hearing then proceeded to testimony from the vocational expert, Ms. Spielman. The ALJ asked Ms. Spielman to consider a hypothetical person of Plaintiff's age and experience, who, in relevant part, could lift or carry 20 pounds occasionally and 10 pounds frequently, could stand or walk for 4 hours in an 8-hour workday, could sit for 6 hours in a workday, could occasionally climb ladders or scaffolds, could not balance in the context of working at unprotected heights, could do simple and routine tasks, could have occasional brief and superficial contact with coworkers and the public, could not work in a fast-paced or high-production-goal environment such as on an assembly line, and could not constantly handle, finger, or reach. (R. 47–48.) With these limitations, Ms. Spielman testified, the person could work as a small products assembler, inspector, hand packager, or garment sorter. (R. 48.) If a limitation to no use of the left hand were added, however, the person could not work in any occupation. (R. 50–51.)

The ALJ issued a written decision on August 20, 2021, concluding that Plaintiff was not disabled. (R. 10–27.) The ALJ followed the familiar five-step sequential analysis outlined in 20 C.F.R. §§ 404.1520 and 416.920. At each step, the ALJ considered whether

Plaintiff was disabled based on the criteria of that step. If she was not, the ALJ proceeded to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of October 7, 2019. (R. 15.) At the second step of the sequential analysis, the ALJ found that Plaintiff had the following severe impairments: obesity, diabetes, "cerebrovascular accident due to moyamoya disease," depression, and anxiety. (R. 15.) At step three, the ALJ concluded that Plaintiff's impairments did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix I. (R. 15.) In the step-three discussion, the ALJ specifically found that Plaintiff's December 2020 stroke was not a severe impairment:

> The claimant testified to no left hand limitation prior to her stroke in December 2020, so the undersigned finds that there are no left hand limits in the residual functional capacity, as there is no 12-month duration supporting left hand limitations. In addition, no provider opined an expectation of left hand limitations [that] existed or are expected to exist for 12 months. Overall, her December 2020 stroke with residual effects is not a severe impairment due to no 12-month duration or expectation of any limits from it for a 12-month duration. Thus, the December 2020 stroke and its specific effects do not further limit the residual functional capacity.

(R. 16.)

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, which is a measure of "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). As part of the RFC assessment, the ALJ considered Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms and whether the statements were consistent with the objective medical evidence and other evidence in the record. (R. 20.) In considering Plaintiff's testimony, the ALJ wrote,

11

"Although she initially asserted she could not work due to left arm and hand weakness, she testified that this was only the case after her December 2020 stroke." (R. 20.) The ALJ also recalled Plaintiff's medical record as containing "a history of strokes with recovery of function as set forth in the treatment records, although she is a bit more limited since the later 2020 stroke." (R. 20.) The ALJ took note of Plaintiff's failure to follow through with surgery and to take her medication as prescribed, but also acknowledged lapses in insurance coverage. (R. 22.) To address "a longstanding degree of left side weakness," the ALJ limited Plaintiff's standing and walking to four hours in an eight-hour workday. (R. 23.)

The ALJ considered Dr. Jankus' consultative examination report from October 2020 and recounted Dr. Jankus' findings regarding strength, gait, sensation, trace or slight clumsiness in the left hand, and no severe fine motor issues. (R. 21.) The ALJ also noted that Dr. Jankus agreed with Plaintiff's assessment of 80% functionality on the left-side upper and lower extremities as "pretty realistic," but pointed out that Dr. Jankus "did not opine any specific left upper and/or lower extremity limitations." (R. 21.)

The ALJ also considered the persuasiveness of Dr. Hammes' medical source statement from January 2021. The ALJ's entire discussion follows:

> The undersigned finds this opinion to be unpersuasive in assessing specific work limitations since October 7, 2019, because the opined limits are not supported by and are not consistent with the objective examination findings, the treatment notes and observations from this and other providers, course of treatment, consultative examination, and overall functioning for any 12-month duration discussed in detail above. The records do not support this degree of limitation persisted or is expected to persist 12 months in duration. It is significant to note that this January 18, 2021 form was completed less than one month after her December 2020 stroke.

12

(R. 24.)

Based on the ALJ's consideration of all the evidence of record, the ALJ assessed

Plaintiff's RFC as follows.

> [Plaintiff] has the residual functional capacity to perform light work as
> defined in 20 CFR 404.1567(b) and 416.967(b) with lifting and/or carrying
> 20 pounds occasionally and 10 pounds frequently, standing and/or walking
> with normal breaks for a total of 4 hours out of an 8-hour workday, sitting
> with normal breaks for a total of 6 hours in an 8-hour workday, occasional
> climbing of ladders, ropes, or scaffolds, no balancing in the context of being
> at unprotected heights, and overall, no work at unprotected heights or with
> hazardous or dangerous moving machinery, in addition to simple routine,
> repetitive types of tasks and instructions that would be fixed and predictable
> from day to day with few, if any, workplace changes in the nature of the tasks
> to be performed, occasional brief and superficial contact with coworkers and
> the public, however, the tasks can be performed independently and would
> not require collaboration or teamwork and would not involve direct serving
> of the public to be completed, and with respect to interaction with
> supervisors, that would be consistent with the Dictionary of Occupational
> Titles' people code designation of no less than an 8 as defined in the
> Dictionary of Occupational Titles and its companion, and finally, no fast pace
> high production goal or quota types tasks such as on an assembly line,
> moving conveyor belt, or requiring constant handling, fingering or reaching
> as defined in the Dictionary of Occupational Titles.

(R. 19.) With this RFC, the ALJ concluded, Plaintiff could not perform her past work as a

home attendant, but she could work as a small products assembler, inspector and hand

packager, and garment sorter. (R. 26.) Consequently, Plaintiff was not disabled. (R. 27.)

The Appeals Council denied Plaintiff's request for review of the ALJ's decision.

(R. 1.) This made the ALJ's decision the final decision of the Commissioner for the purpose

of judicial review.

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ committed an error of law, *Nash v. Commissioner, Social Security Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or because the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for DIB and SSI, the claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The disability, not just

the impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## III.    Discussion

### A.    The ALJ Erred in Determining that Plaintiff Had No Left-Hand Limitations.

Plaintiff argues that the ALJ failed to fully account in the RFC assessment for the limitations caused by Plaintiff's moyamoya disease and resultant strokes. The Court agrees. The ALJ's decision not to include *any* left-hand limitations in the RFC is not supported by substantial evidence of record. Although the degree of limitation that existed immediately after Plaintiff's December 2020 stroke might not have met the 12-month durational requirement, the record does not support a finding that there were *no* left-hand limitations that would meet the 12-month durational requirement.

The first reason why the record does not support a finding that there were no left-hand limitations that would meet the 12-month durational requirement after the December 2020 stroke is Plaintiff's history of long-term, left-hand limitations after her November 2018 stroke. In October 2020, almost two years after the November 2018 stroke, but before the December 2020 stroke, Plaintiff told Dr. Jankus that her left leg felt heavy and her left hand was slower than her right hand. Plaintiff estimated that her left hand, arm, foot, and leg had about 80% of the strength and functioning of her right hand, arm, foot, and leg, and Dr. Jankus agreed. In November 2020—two years after the November 2018 stroke, but still before the December 2020 stroke—Plaintiff reported numbness and tingling in her left hand and left-side weakness to Dr. Hammes, and the doctor's physical examination

confirmed that Plaintiff's left-hand grip was weaker than her right-hand grip and that Plaintiff had numbness and tingling in her left hand. It would be illogical to conclude that Plaintiff would not continue to have *at least* these limitations after her December 2020 stroke.

To support Defendant's argument that substantial evidence supported the ALJ's finding that Plaintiff's stroke did not have residual effects for 12 months or more, Defendant relies on a treatment record from speech pathologist Jenna Kuntz, who commented that Plaintiff "was at or near baseline level of function." (Def.'s Mem. at 5 (citing R. 800), Dkt. No. 16.) Defendant argues, "Baseline functioning is normal functioning." (*Id.*) The Court does not disagree with Defendant on the meaning of "baseline functioning," but Defendant has taken Ms. Kuntz's comment out of context. Ms. Kuntz was simply summarizing her review of Plaintiff's chart as part of an initial assessment for speech therapy services. (R. 800.) Ms. Kuntz did not make any independent findings of Plaintiff's left-side functioning. Moreover, Ms. Kuntz's comment about baseline functioning related specifically to a visit that a speech-language pathologist ("SLP") made to Plaintiff in the hospital: "She was also seen by SLP during most recent [hospitalization] and it was determined that patient was at or near baseline level of function." (R. 800.) This hearsay that is limited to speech-language pathology is not substantial evidence of Plaintiff's left-side functioning.

The second reason why the record does not support the ALJ's finding that there were no left-hand limitations that would meet the 12-month durational requirement after the December 2020 stroke is that the ALJ either mischaracterized Plaintiff's testimony or

failed to resolve inconsistencies in her testimony. Plaintiff did *not* testify "to no left hand limitation prior to her stroke in December 2020" (*see* R. 16), which is the reason the ALJ gave for not including left-hand limitations in the RFC.

Confusion over the date of the "second stroke" and when Plaintiff experienced left-hand limitations arose at the hearing when the interpreter attempted to clarify Plaintiff's testimony by asking her about the "last – the second stroke" after Plaintiff testified that her left-hand limitations dated back to November 2019. Plaintiff's representative increased confusion over dates by mistakenly stating that Plaintiff had a stroke just before she stopped working in October 2019. (R. 44 (Q: "[Y]ou stopped working as a PCA in October of 2019? A: Yes. Q: Okay, because that's when you had a stroke.")  Rather than describing the four known strokes by date, however, the interpreter, Plaintiff's representative, and Plaintiff all referred to the "second stroke" instead of referring to the stroke by date. The dates of the strokes matter. Indeed, the second known stroke occurred in 2017, and if Plaintiff was referring to that stroke when she testified about when her left-hand limitations began, her testimony would establish that the limitations met the 12-month durational requirement, contrary to the ALJ's finding that Plaintiff "testified to no left hand limitation prior to her stroke in December 2020."

Furthermore, Plaintiff's third stroke occurred in November 2018—not November 2019, which is when Plaintiff testified her left-hand limitations began—but the dates are similar enough that Plaintiff might have intended to testify (or did testify, and the interpreter mis-clarified the year) that her left-hand limitations dated back to November 2018. If so, that testimony would also be at odds with the ALJ's finding that Plaintiff did

not testify to limitations preceding the December 2020 stroke. The testimony would also correspond with findings from Dr. Hammes in November 2020 that Plaintiff had numbness, tingling, and weakness in her left hand, and from Dr. Jankus in October 2020 that Plaintiff had only 80% functionality in her left arm and hand. Several treatment notes document Plaintiff's confusion and difficulties with an interpreter at her medical appointments.

When it was the ALJ's turn to question Plaintiff, the ALJ did refer to the "most recent stroke . . . towards the end of 2020." (R. 43.) But the ALJ did not ask Plaintiff specifically about left-hand limitations following that stroke. Rather, the ALJ asked Plaintiff how she spent her days before the December 2020 stroke. Plaintiff answered that she mostly sat around, but did some minor dishwashing, swept the floor, shopped for groceries, and ran errands. Those activities are not necessarily incompatible with some degree of left-hand limitation, and it was not an accurate characterization of Plaintiff's testimony to say that she testified to no left-hand limitations before the December 2020 stroke.

In light of evidence that Plaintiff had left-hand limitations after her November 2018 stroke, the confusion at the hearing about which stroke happened when, and Plaintiff's actual testimony about her left-hand limitations and daily activities, the ALJ's decision not to include any left-hand limitations in the RFC is not supported by substantial evidence of record. The error is not harmless because all of the jobs identified by the ALJ at step five require frequent reaching and handling, and at least occasional fingering. (R. 26, 48); *Dictionary of Occupational Titles* 706.684-022 (Assembler, Small Products I), 559.687-

074 (Inspector and Hand Packager), 222.687-014 (Garment Sorter). Although the RFC assessed by the ALJ precluded constant handling, fingering, or reaching, this limitation applied to right hand as well as the left, and thus, no particular consideration was given to specific left-hand limitations. The Court will remand the matter for the ALJ to consider whether any left-hand limitations satisfied the 12-month durational requirement, with particular consideration given to Plaintiff's testimony and the corresponding medical evidence of record. The ALJ may also choose to take additional testimony from Plaintiff.

Plaintiff suggests that the ALJ should have retained a medical expert or ordered another consultative examination to explain how the December 2020 stroke and resulting, long-term limitations affected her RFC. The Court will not require the ALJ to take either action on remand, but the ALJ may certainly choose to retain a medical expert or order a new consultative examination in resolving any insufficiencies or inconsistencies in the record. *See* 20 C.F.R. §§ 404.1520b(b); 416.920b(b).

**B.     The ALJ Erred in Considering Dr. Hammes' Opinion.**

Plaintiff argues that the ALJ erred in considering the persuasiveness of Dr. Hammes' medical opinion dated January 18, 2021. The ALJ found the opinion unpersuasive primarily because the ALJ found the opinion did not support a finding that the degree of limitation Plaintiff had one month after her December 2020 stroke would persist for at least 12 months.

Title 20 C.F.R. §§ 404.1520c and 416.920c set forth the standards under which an ALJ considers medical opinion evidence. An ALJ considers how "persuasive" an opinion is according to five factors: supportability, consistency, relationship with the claimant,

19

specialization, and any other relevant factors. 20 C.F.R. §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5). The "most important factors" are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ "may, but [is] not required to," explain how the remaining factors were considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The regulatory language pertaining to supportability provides that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In evaluating consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). In other words, supportability looks to how well the medical source justifies their own opinion, and consistency looks to how well the medical source's opinion fits with evidence from other sources.

Given that the supportability and consistency factors are the most important factors to the persuasiveness determination, an ALJ "will explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions . . . ." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "The ALJ need not use the magic words of 'supportability' and 'consistency,' but it must be clear they were addressed." *Svendsen v. Kijakazi*, No. 1:21-CV-1029-CBK, 2022 WL 2753163, at *8 (D.S.D. July 14, 2022). The

ALJ's failure to articulate how he or she considered these factors is a legal error that warrants remand. *Susan H. v. Kijakazi*, No. 21-CV-2688 (ECT/ECW), 2023 WL 2142786, at *3 (D. Minn. Feb. 21, 2023); *Michael B. v. Kijakazi*, No. 21-CV-1043 (NEB/LIB), 2022 WL 4463901, at *2 (D. Minn. Sept. 26, 2022); *Joel M. B. v. Kijakazi*, No. 21-CV-1660 (PAM/ECW), 2022 WL 1785224, at *3 (D. Minn. June 1, 2022) (citing *Lucus v. Saul*, 960 F.3d 1066, 1070 (8th Cir. 2020)).

With respect to supportability and consistency, the ALJ found Dr. Hammes' opinion unpersuasive in part because it was "not consistent with the objective examination findings, the treatment notes and observations from this and other providers, course of treatment, consultative examinations, and overall functioning." (R. 24.) These general references to the overall record do not satisfy the ALJ's obligation to articulate how the ALJ considered the supportability and consistency factors. The ALJ did not identify any inconsistent evidence from other providers or undermining evidence from Dr. Hammes herself in her discussion of Dr. Hammes' opinion, nor did the ALJ explain in any detail how the supportability and consistency factors were considered such that this Court could make a meaningful assessment of the ALJ's consideration of the opinion.

The only other bases the ALJ gave for finding Dr. Hammes' opinion unpersuasive were that Dr. Hammes completed the form only one month after Plaintiff's December 2020 stroke and that the ALJ did not expect the limitations caused by the December 2020 stroke to last for 12 months. The Court finds that to consider the residual effects of each of Plaintiff's strokes in isolation, however, is to disregard the chronic and progressive nature of moyamoya disease. As a judge in the Northern District of Illinois said, when considering

an ALJ's perfunctory summary of the medical evidence for a claimant with moyamoya disease, "That's it: stroke, surgery, discharge. It really doesn't seem terribly bad at all, when one puts it that way." *Michelle F. v. Kijakazi*, No. 22 C 0183, 2022 WL 5183904, at *5 (N.D. Ill. Oct. 5, 2022). Here, the ALJ's summary of Plaintiff's moyamoya disease might read: stroke, recovery, stroke, recovery, stroke, recovery, stroke, a bit more limited in recovery. The unpredictable nature, timing, and persistence of the strokes and resultant limitations—a characteristic of moyamoya disease—should not be the basis to find a medical opinion unpersuasive. Over and above that, the confusion over which stroke anybody in this case was referring to at any given time means that the ALJ erroneously concluded that Dr. Hammes' opinion was premised only on Plaintiff's December 2020 stroke. It was not so limited, as detailed above.

The Commissioner offers several post-hoc rationalizations for the ALJ's consideration of the supportability and consistency factors and points to evidence from Dr. Hammes and others that the ALJ did not include in her consideration of these factors. The Court cannot accept these post-hoc arguments. *See Stafford v. Kijakazi*, No. 4:20-CV-1011-NKL, 2022 WL 358061, at *4 (W.D. Mo. Feb. 7, 2022); *Shanda v. Colvin*, No. 14-CV-1838 (MJD/JSM), 2015 WL 4077511, at *30 (D. Minn. July 6, 2015) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 87 (1943)) (limiting judicial review of an agency's final decision to the bases given in the decision). "It is not the role of this Court to speculate on the reasons that might have supported the ALJ's decision or supply a reasoned basis for that decision that the ALJ never gave." *Stacey S. v. Saul*, No. 18-cv-3358 (ADM/TNL),

2020 WL 2441430, at *15 (D. Minn. Jan. 30, 2020), *R. & R. adopted*, 2020 WL 1271163 (D. Minn. Mar. 17, 2020).

> **C.     The ALJ's Preclusion of Constant Handling, Fingering, or Reaching Is Consistent with Dr. Jankus' Finding that Plaintiff's Left Arm and Hand Functioned at About 80%**

Plaintiff contends that the ALJ's preclusion of constant handling, fingering, or reaching is not consistent with Dr. Jankus' finding that Plaintiff's left arm and hand functioned at about 80%.[6] Defendant responds that Dr. Jankus noted mostly normal functioning and did not offer any specific left-side limitations.

The Court finds that the ALJ's handling, fingering, and reaching limitation is not at odds with Dr. Jankus' findings. Dr. Jankus made some objective findings from his examination of Plaintiff, such as symmetric strength and reflexes, full strength, smooth gait, a "trace" amount of clumsiness and weakness in her left hand, and no severe fine motor issues. He also agreed with Plaintiff that she had about 80% functionality in her left arm and hand. Plaintiff has not explained how these findings are incompatible with the ability to constantly handle, finger, or reach. "Constantly" describes an activity or condition that exists two-thirds or more of the time. *E.g.*, *Dictionary of Occupational Titles* 222.687-014 (Garment Sorter). Dr. Jankus' objective findings are not inconsistent with an ability to handle, finger, or reach two-thirds of the time. Notably, however, as the ALJ acknowledged

---

[6] Plaintiff identifies other inconsistencies between Dr. Jankus' report and the RFC, but those are based on Plaintiff's subjective reports to Dr. Jankus (*e.g.*, number of falling episodes, how long she could stand and walk in an eight-hour period), not his objective observations or findings. The Court's discussion is limited to Dr. Jankus's objective observations and findings.

in the written decision, Dr. Jankus did not identify any specific left upper or lower extremity limitations, so it is not possible to know for certain whether Dr. Jankus would agree that Plaintiff could constantly handle, finger, or reach with her left hand and arm.

## IV.   Conclusion

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. The relief requested in Plaintiff's Brief (Dkt. No. 12) is **GRANTED**.

2. The Commissioner's decision is reversed and the matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for consideration of (a) whether any left-hand limitations satisfied the 12-month durational requirement, with particular consideration given to Plaintiff's testimony and corresponding medical evidence of record; and (b) consideration of Dr. Sarah Hammes' medical opinion pursuant to 20 C.F.R. §§ 404.1520c and 416.920c.

3. Defendant's Motion for Summary Judgment (Dkt No. 15) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date: March 28, 2024                          *s/ John F. Docherty*
                                              JOHN F. DOCHERTY
                                              United States Magistrate Judge